**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARCUS WALTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2: 13-cv-1109 |
| ) | |
| CORRECTIONAL OFFICER ) | |
| HARKLEROAD; CORRECTIONAL ) | |
| OFFICER RAMBLER; CORRECTIONAL ) | |
| OFFICER JOHNSON; CORRECTIONAL ) | |
| OFFICER BAKER; CORRECTIONAL ) | |
| OFFICER SMITH; CORRECTIONAL ) | United States Senior District Judge |
| OFFICER GRIBBLE; CORRECTIONAL ) | Maurice B. Cohill, Jr. |
| OFFICER CRAINE; CORRECTIONAL ) | |
| OFFICER GOULD; CORRECTIONAL ) | |
| OFFICER RAMIREZ; CORRECTIONAL ) | |
| LIEUTENANT ERIC GREGO; ) | |
| CORRECTIONAL LIEUTENANT ) | United States Magistrate Judge |
| SHRADER; CORRECTIONAL ) | Cynthia Reed Eddy |
| LIEUTENANT TONY; HEARING ) | |
| EXAMINER FRANK NUNEZ; ) | |
| CORRECTIONAL OFFICER JOHN DOE ) | |
| 1; PENNSYLVANIA'S CONTRACT ) | |
| MONITOR S. KARANSKI; RUM ) | |
| BARBIER; and ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

Plaintiff Marcus Walton is an inmate currently housed at SCI-Greene. He initiated this action *pro se* pursuant to 42 U.S.C. § 1983 claiming that the above-captioned Defendants are liable for violating his rights under the First, Eighth and Fourteenth Amendments of the United States Constitution. Walton also claims that Defendants are liable for the tort of conversion under Pennsylvania common law. Currently pending before the Court is Defendants' motion for summary judgment. ECF No. 88. For the reasons that follow, it is respectfully recommended

that Defendants' motion be granted in part and denied in part. Specifically, the Court recommends granting summary judgment on all of Walton's claims except for his Eighth Amendment claim against Officer Harkleroad. The Court also recommends dismissing Defendant Correctional Officer John Doe 1 in accordance with Rule 21 of the Federal Rules of Civil Procedure.

## II. REPORT

### A. Facts

For purposes of resolving the pending motion for summary judgment, the evidence is viewed in a light most favorable to Walton; however, at this stage, "we do not … accept as true allegations unsupported in the record."[1]

<u>Confiscation of Walton's Property in May 2011 after Returning from Michigan</u>

In December 2010, a group of inmates from SCI-Greene, including Walton, were transferred to Muskegon Correctional Facility ("MCF") in Michigan where they stayed until May 2011. Six boxes and one tub of Walton's personal property were held at SCI-Greene while Walton was at MCF.

Towards the end of Walton's stay at MCF, on April 8, 2011, Walton was placed in the segregation unit and kept there for the remainder of his time at MCF. As a result, Walton's property was packed, inventoried, and sealed for the return trip to SCI-Greene outside of his presence. Walton was transferred back to SCI-Greene on May 4, 2011. Upon Walton's return to SCI-Greene, several personal hygiene items that Walton purchased at MCF were confiscated because, although permitted at MCF, they were prohibited at SCI-Greene. Walton filed a

---

[1] See <u>Weist v. Tyco Electronics Corp.</u>, — F.3d —, —, 2016 WL 386088, *1 (3d Cir. Feb. 2, 2016).

grievance regarding the confiscation of these items,[2] which was denied through the initial response, and the denial was ultimately upheld by Final Appeal Decision on July 5, 2011.[3]

Walton also discovered that he was missing several of his personal property items that were held at SCI-Greene during his stay at MCF.[4] Walton filed a separate grievance regarding these missing items.[5] This grievance was upheld in part because several of Walton's missing property items were discovered and returned to him after this grievance was filed.[6] The remainder of the grievance was considered but denied.[7] Plaintiff appealed the portion of the response denying the grievance, however, the response was upheld by the facility manager on June 24, 2011.[8]

Search of Walton's Cell in October 2012

Several months later, on October 28, 2012, Defendant Correctional Officers Harkleroad and Rambler conducted a search of Walton's cell. They asked Walton if there was any contraband in his cell, to which Walton responded in the negative, and they proceeded to search

---

[2] Def.s' Ex. 23, Grievance 366071, ECF No. 91-2 at 41.

[3] Id. at 42-47.

[4] Additionally, Walton contends that a John Doe officer at either MCF or SCI-Greene damaged his television, however, he has been unable to identify this individual's identity.

[5] Def.s' Ex. 24, Grievance 366072, ECF No. 91-2 at 49-50.

[6] Id. at 52.

[7] Id.

[8] Id. at 54-55. Additionally, although this incident is not referenced in the complaint and not part of Walton's procedural due process claims, the Court notes that Walton's boots were confiscated by Lieutenant Tony on July 12, 2011, as Lieutenant Tony asserted that the boots were prohibited at SCI-Greene. Walton filed a grievance, which was initially denied on August 9, 2011. (Def.s' Ex. 25, Grievance 374262 at 57-60). The denial of the grievance was upheld by the facility manager on September 7, 2011. (Id. at 61-63). Notwithstanding these denials, Walton was subsequently offered $50 for the destruction of the boots, which he accepted, although he claims the boots were worth more money and he was forced to accept this amount. (Def.s' Ex. 26, ECF No. 91-2 at 66-67; Pl.'s Rsp to Def.s' Stmt of Facts at ¶ 69, ECF No. 107; Pl.'s Ex. F, ECF No. 105-1 at 116).

his cell. As a result of the search, Officer Harkleroad issued Walton a misconduct report, asserting that the search revealed numerous items of contraband, including twenty-two pages of pornography and a Polo watch.[9] All of the items were confiscated by Officer Harkleroad.

Officer Harkleroad then took Walton to a different room to question him about the Polo watch. Officer Harkleroad claims to have known that the watch was not Walton's because Harkleroad received information that SCI-Greene staff members had brought two identical watches into the institution. According to Officer Harkleroad, Walton admitted that Walton did not own the watch. However, Walton disputes ever admitting to Officer Harkleroad that Walton did not own the watch. Walton instead asserts that when Officer Harkleroad took Walton to the separate room, Harkleroad attempted to "extort" Walton by confiscating the watch and threatening to file a misconduct against Walton if Walton did not buy five packs of cigarettes from Harkleroad for $8 per pack. Walton claims that as this was occurring, he saw Lieutenant Shamp enter the block, so Walton notified Lieutenant Shamp of Officer Harkleroad and Rambler's "unethical procedures and their attempt to extort Plaintiff out of his property."[10] Walton did not cooperate with Officer Harkleroad's request. Walton claims that Officer Harkleroad filed a misconduct against Walton for possession of contraband in retaliation for failing to buy the cigarettes in exchange for the watch and also for notifying Lieutenant Shamp of the situation.[11]

On October 30, 2012, Walton had a hearing on the misconduct that Officer Harkleroad

---

[9] Def.s' Ex. 2, Misconduct B556776, ECF No. 91-1 at 7. In addition to the Polo watch, the misconduct listed three typewriter ribbons with the wire removed from the inside, three cassette tapes, one green pepper, one green onion, one full bottle of white out, one pair of brown and orange Columbia sneakers, one pair of large nail clippers, and one excess razor.

[10] Compl. at ¶ 17, ECF No. 8.

[11] Id. at ¶ 20; Pl.'s Rsp. to Def.s' Stmt of Facts at ¶¶ 8-10, ECF No. 107.

had issued for possession of contraband. Walton pled guilty before the hearing examiner to possession of pornography only, and received a punishment of 30 days in the restricted housing unit ("RHU"), resulting in all other charges being dismissed.[12] Thereafter, Walton appealed this sanction, asking to withdraw his guilty plea due to "new developments" regarding Officer Harkleroad; however, Walton's guilty plea was upheld on appeal.[13]

Walton also utilized SCI-Greene's grievance procedures in an attempt to recover or receive compensation for his confiscated property, including the watch.[14] Defendant Lieutenant Shrader investigated these grievances and interviewed Walton together with Defendant Lieutenant Grego. Walton told these lieutenants that he acquired the watch during his stay at MCF and brought it back with him to SCI-Greene. Lieutenant Shrader, however, informed Walton that Officer Harkleroad had checked Walton's property sheet and that this watch was not on it. Instead, Walton's property sheet from May 10, 2011 shows that the only watch in Walton's possession was a Timex, not a Polo.[15] Lieutenant Shrader therefore denied these grievances relating to the watch based on the fact that it was not on Walton's property sheet associated with his transfer from MCF to SCI-Greene.

Allegations that Officer Harkleroad Labeled Walton a Snitch to Other Inmates

Walton contends that when he was spending his 30 days in the RHU in November 2012,

---

[12]   Def.s' Ex. 2, Misconduct B556776, ECF No. 91-1 at 8.

[13]   Id. at 9-13. Specifically, Walton asserted that he learned for the first time on November 1, 2012 (two days after he pled guilty) that Officer Harkleroad told his supervisor that Walton admitted that the watch was given to Walton by an SCI-Greene staff member. Id. at 12. Walton claimed that if he would have known this information at the time of his hearing, he would have challenged the authenticity of the entire misconduct report. Id.

[14]   See Def.s' Ex. 4, 5, 6 relating to Grievance 434575, ECF No. 91-1 at 23-27; Grievance 436342, id. at 29-32 (which Walton did not appeal); Grievance 436347, id. at 34-36 (which was rejected because it was inappropriately challenging the misconduct).

[15]   Def.s' Ex. 4, Inmate Personal Property Inventory A960223, ECF No. 91-1 at 27.

Officer Harkleroad began going around the jail falsely telling other inmates that Walton was a snitch for informing Officer Harkleroad that a staff member at SCI-Greene gave Walton the watch. Although Officer Harkleroad denies these allegations, Walton has submitted declarations from other inmates supporting his position that Harkleroad was spreading these rumors to other inmates.

Walton provided a declaration from William Shaw wherein Shaw states that he personally heard another inmate ask Officer Harkleroad "why he kept locking … Walton up," to which Harkleroad responded, "F**k that snitch, all he had to do was me pay [*sic*] the five (5) packs of Marlboro Cigarettes, and I would have gave all his s**t back."[16] Shaw further asserted that, "They (security) actually stole this man's property, and called him a snitch throughout the prison compound for trying to get his property back; and because he filed a grievance on it, there are all these lies against him."[17] Walton also submitted a declaration from Gary Walker stating that there were rumors throughout SCI-Greene that Walton was a snitch, which stemmed from Officer Harkleroad.[18] A declaration from inmate Nathan Riley also states that there were rumors throughout the prison that "Walton told on a 'staff member' for bringing something in the prison."[19]

Furthermore, Walton submitted a request slip addressed to Superintendent Folino on January 16, 2013 stating that Officer Harkleroad put a lie into the general population that Walton

---

[16]  Pl.'s Ex. 6, ECF No. 105-1 at 40. As will be discussed below, this declaration provides that this statement occurred on September 3, 2013, approximately ten months after Walton was in the RHU for pleading guilty to possession of pornography.

[17]  Id.

[18]  Id. at 41.

[19]  Pl.'s Ex. 9, ECF No. 105-1 at 55.

told on a staff member for bringing him a watch.[20]

<u>Walton's Physical Altercations after his Release from the RHU</u>

In late December 2012, Walton claims that he was involved in two physical altercations as a result of the rumors that had circulated throughout the prison labeling Walton a snitch while Walton was in the RHU.[21] Walton contends that the first incident occurred on December 30, 2012 when an unknown inmate aggressively confronted Walton calling him a "f\*\*king rat" for snitching on a staff member. Walton contends that he defended himself by knocking out this unknown inmate. The next day, December 31, 2012, Walton was again attacked, this time in his cell by an inmate when he was taking an afternoon nap. As discussed in the following section, the jail determined that this attacker was inmate Nathan Riley; however, Walton disputes that Riley was the attacker and rather contends that this individual was an unknown inmate. Walton was again able to defend himself until this individual retreated from Walton's cell.

<u>Investigation of Walton for Fighting another Inmate & Walton's Guilty Plea</u>

On January 1, 2013, the security office at SCI-Greene received information about a possible fight that occurred the previous day between Walton, inmate Nathan Riley, and another inmate. Walton was interviewed by Officers Johnson and Gribble and then taken to medical where he was assessed for injuries. Walton had a laceration above his eye and swelling and bruising on his lower lip. Walton told the nurse that he received those injuries playing basketball. Walton was ultimately issued a misconduct from Officer Baker for fighting inmate Riley.[22] This misconduct states that the security office reviewed video from December 31, 2012

---

[20]    Pl.'s Ex. C, ECF No. 105-1 at 107.

[21]    <u>See</u> Compl. at ¶¶ 33-44, ECF No. 8.

[22]    Def.s' Ex. 7, Misconduct B561570, ECF No. 91-1 at 38.

because it received information that Walton and Riley fought in Walton's cell. It provides that Riley entered Walton's cell at 1306 hours and exited at 1307:54 hours and that although Walton refused to give a statement about the fight, Riley stated to Officer Baker that Riley went into Walton's cell "to smash him about having words the other day."

On January 9, 2013, at Walton's hearing on this misconduct, Walton pled guilty for fighting Riley and received 30 days in the RHU, effective January 1, 2013.[23] Walton contends, however, that this hearing violated his due process because he was misled as to the underlying facts and warned that the hearing examiner, Defendant Nunez, would issue Walton a larger sentence if Walton was found guilty.[24] Walton appealed his 30 day sentence in the RHU for pleading guilty to this misconduct, however, the decision of the hearing examiner was sustained by the Program Review Committee ("PRC").

Inmate Riley also received a misconduct from Officer Baker for fighting Walton. Riley was found guilty for fighting Walton and received 90 days in the RHU.

<u>Confiscation of Walton's Food when Placed in RHU for Fighting</u>

When an inmate is placed in the RHU, DOC policy requires that the inmate's property be inventoried. Therefore, when Walton received 30 days in the RHU after pleading guilty to fighting with inmate Riley, his property was packed and inventoried. During this process, several food items (commissary) belonging to Walton were confiscated.[25] Walton filed a

---

[23] <u>Id.</u> at 40.

[24] <u>Id.</u> at 41.

[25] Def.s' Ex. 13, ECF No. 91-1 at 73. These items included two Gatorades, four honey buns, a bag of cereal, nine fish sticks, one pickle, one box of crackers, one box of tea, two bagels, ten soups, one meat stick, one cheese, and four bags of rice.

grievance relating to the confiscation of these items.[26]  The grievance was denied, finding that the confiscation of commissary items cannot be disputed and that it was the result of an "overabundance of property and food documented during the inventory process."[27]  Walton appealed the denial of this grievance, claiming that his property was not excessive and would have fit if packed properly.  However, the initial denial of his grievance was upheld by the facility manager and then by the chief grievance officer by final appeal decision dated June 13, 2013.[28]

<u>Placement of Walton in Administrative Custody</u>

After Walton's 30 days in the RHU expired at the end of January 2013, Walton was kept in the RHU in administrative custody.  The PRC determined that if Walton were to return to general population, his safety would be endangered.[29]  According to the PRC, Walton "verified possible problems if released to [general population.]"[30]  Walton disputes ever making such a statement.  However, on January 16, 2013, Walton submitted a request slip addressed to Superintendent Folino which states the following:

> I am writing you about a lie that was put into the General Population, and has caused my life to be put in danger.  It is alleged by COI Harkleroad that "I told" him a staff member bought [*sic*] me in a watch from the streets.  I wasn't placed on [Administrative Custody] nor received an Other Reports, however, various staff members and a larger portion of the General Population now frown upon me. This man lies has created and had lead [*sic*] me into verbal, and now a physical

---

[26]  Def.s' Ex. 14, Grievance 444505, ECF No. 91-1 at 75.

[27]  <u>Id.</u> at 76.

[28]  <u>Id.</u> at 77-80.

[29]  <u>See</u> ECF No. 58-1 at 36.  This exhibit was previously submitted by Defendants in their partial motion for summary judgment regarding exhaustion.  The Court must refer to it here because when Defendants resubmitted it as Exhibit 10 in their Appendix to the pending motion for summary judgment, they apparently re-scanned the previous exhibit, resulting in the document being illegible.

[30]  <u>Id.</u> at 37.

altercation. Prior to this Man's antics, I was [misconduct] free and looked upon as a productive inmate. **This man has put me into a position where I may get harmed or cause me to receive more [misconducts] to prevent myself from being harmed. These lies has created a lot of enemies for me, and has placed me in a position to be killed … or harmed …**[31]

Deputy Lorinda Winfield responded on January 22, 2013 stating that "I will send this to Capt. Haywood to look at."[32]

Walton remained in the RHU until August 20, 2013 when he was released back into general population.[33]

<u>Snitch Rumors when Walton was in the RHU from January – August 2013</u>

Walton also submitted declarations from inmates providing that Walton was labeled a snitch regarding the misconduct and punishment he received for fighting inmate Riley when he was in the RHU in January and held there in administrative custody from February – August 2013. Ramon Sanchez provided a declaration that around June 2013, he "finally spoke to Mr. Walton and notified him about the rumors that was [*sic*] circulating in general population of him being a snitch" pertaining to the incident with inmate Riley.[34] Eric Tulio provided a declaration stating that on or around August 22, 2013, there were rumors that Walton was a snitch regarding "an altercation that took placed [*sic*] between [Walton] and another inmate," which has damaged Walton's reputation because "this word snitch is an irreparable harm in the prison."[35]

Walton also provided a declaration from inmate Riley – the individual that Walton pled

---

[31]   Pl.'s Ex. C, ECF No. 105-1 at 107 (emphasis added).

[32]   <u>Id.</u>

[33]   Def.s' Ex. 1, ECF No. 91-1 at 5.

[34]   Pl.'s Ex. 6, ECF No. 105-1 at   43.

[35]   <u>Id.</u> at 42.

guilty to fighting with.[36]  Riley stated that when Walton was placed in the RHU after pleading guilty to fighting and then held in administrative custody until August 2013, Riley, as well as other staff members and inmates, believed Walton had snitched and then voluntarily taken "self-lock up," especially in light of the fact that Walton was previously rumored to be a snitch for telling on a staff member about the watch.  However, when Walton was released from the RHU and spoke with Riley, Riley states that he realized that Walton was not a snitch.

Procedural History

Walton initiated this action in July 2013.[37]  The complaint asserts that Defendants are liable for the following violations: (1) Eighth Amendment – Failure to Protect; (2) Fourteenth Amendment – Procedural Due Process for confiscation of property; (3) Fourteenth Amendment – Procedural Due Process relating to misconduct hearing; and (4) the common law tort of conversion under Pennsylvania law.  Moreover, even though it is not asserted in a separate count, Defendants' pending motion for summary judgment notes that the complaint possibly asserts a First Amendment retaliation claim.  Defendants contend that they are entitled to summary judgment on all of these claims.[38]  The matter has been fully briefed, the record has been fully developed, and the matter is now ripe for disposition.[39]

**C.    Standard of Review**

Summary judgment is appropriate if the "movant shows that there is no genuine dispute

---

[36]    Pl.'s Ex. 9, ECF No. 105-1 at 55.

[37]    ECF No. 8.

[38]    ECF No. 88.

[39]    See ECF No. 89, 90, 91, 105, 106, 107, 108, 115.

as to any material fact and the movant is entitled to judgment as a matter of law."[40]  A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law.[41]  At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[42]  In this regard, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party.[43]

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact.[44]  The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."[45]  If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor.[46]  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the

---

[40]   Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

[41]   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[42]   Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations).

[43]   Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

[44]   Celotex, 477 U.S. at 323–24.

[45]   In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325.

[46]   Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

entry of summary judgment because such a failure "necessarily renders all other facts immaterial."[47]

Moreover, because Walton is proceeding *pro se*, the Court is required to liberally construe his pleadings.[48] Thus, if the court can reasonably read Walton's pleadings together with his evidentiary submissions to show an entitlement to relief, the Court should do so despite any failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements.[49] Nonetheless, at the summary judgment stage of the proceedings, the Court is not required to credit any "bald assertions" or "legal conclusions" that are unaccompanied by evidentiary support.[50]

### D. Discussion

### 1. Procedural Due Process – Confiscation of Property Claims

Walton alleges that in two separate incidents in May 2011 and January 2013 he was deprived of his personal property in violation of the Procedural Due Process Clause of the Fourteenth Amendment. Regarding the May 2011 incident when Walton was transferred from MCF in Michigan back to SCI-Greene and discovered that he was missing some of his property and that his other property was confiscated by SCI-Greene guards, Walton asserts that SCI-Greene Defendants Gould, Craine, and Tony and MCF Defendants Karpinski[51] and Barbier are

---

[47]   Celotex Corp., 477 U.S. at 322–23; Jakimas v. Hoffman–La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

[48]   Haines v. Kerner, 404 U.S. 519, 520–521 (1972).

[49]   Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir.1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance").

[50]   Morse v. Lower Marion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

[51]   This Defendant is incorrectly identified in the caption as "S. Karanski."

liable for acting in concert to deprive Walton of his property.[52]  Regarding the January 2013 incident where Walton's food items were confiscated after Walton pled guilty to fighting Riley and received 30 days in the RHU, Walton claims that Defendants Craine, Gould, and Ramirez should be found liable.[53]  However, Defendants assert that they are entitled to summary judgment on these claims because Walton had access to a meaningful postdeprivation remedy – the prison grievance procedure.

The Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law."[54]  "Thus, to establish a claim under the Due Process Clause, a plaintiff must show that he had a protected liberty or property interest of which he has been deprived, and that the process afforded him did not comport with constitutional requirements."[55]  "[A]n unauthorized intentional deprivation" of an inmate's property by prison officials "does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."[56]  The United States Court of Appeals for the Third Circuit has consistently held that the availability of the prison's grievance procedure is a meaningful postdeprivation remedy.[57]  The plaintiff bears the burden of establishing that the

---

[52]  Compl. at ¶¶ 107-123, ECF No. 8.

[53]  Id. at ¶¶ 124-140.

[54]  U.S. Const. amend. XIV, § 1.

[55]  Ray v. Rogers, 2014 WL 1235905, *3 (W.D.Pa. 2014) (citing Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000)).

[56]  Hudson v. Palmer, 468 U.S. 517, 533 (1984).

[57]  See, e.g., Tillman v. Lebanon Cty. Corr. Fac., 221 F.3d 410, 422 (3d Cir. 2000) (the prison's grievance program, which allowed prisoners to complain about any matter that is unjust and provided for direct appeal to the warden, was an adequate postdeprivation remedy); Petko v. Radle, 593 Fed. App'x 94, 96 (3d Cir. 2014) ("Petko received due process because he had access to and took

grievance procedure was not meaningful.[58]  Walton has failed to make such a showing.

As set forth above, Walton filed several grievances relating to his missing property and the confiscation of his property in May 2011 as well as the confiscation of his property in January 2013.  He appealed the portions of the decisions denying his grievances, which were upheld on appeal.  Walton "may not agree with the outcome of his grievance[s], but his complaints were aired and assessed by the appropriate officials."[59]  Accordingly, Defendants are entitled to summary judgment on Walton's claims under the Procedural Due Process Clause of the Fourteenth Amendment relating to his missing and/or confiscated property that occurred in May 2011 and July 2013.[60]

### 2.  Common-Law Conversion Claim

Walton also contends that SCI-Greene Defendants Craine, Gould, Tony, and Ramirez and MCF Defendants Karpinski and Barbier are liable for the tort of common law conversion under Pennsylvania law for the confiscation of his property in May 2011 and/or January 2013.  Defendants contend that they are entitled to sovereign immunity on this claim.  In general, employees of the Commonwealth of Pennsylvania acting within the scope of their duties enjoy

---

advantage of an adequate post-deprivation remedy – the Pennsylvania D.O.C.'s grievance procedure."); Crosby v. Piazza, 665 Fed. App'x 168, 172 (3d Cir. 2012) ("Adequate remedies were available here as Crosby was provided an opportunity to file an administrative grievance.").

[58]  Monroe v. Beard, 536 F.3d 198, 210 (3d Cir. 2008).

[59]  See Fears v. Beard, 532 Fed. App'x 78, 81 (3d Cir. 2013).

[60]  Moreover, although Walton's complaint does not expressly assert that his due process rights were violated in connection with the confiscation of his Polo watch in October 2012, the Court notes that Walton filed multiple grievances relating to the watch and that he specifically failed to appeal the denial of Grievance 436342.  Accordingly, to the extent that Walton contends that his procedural due process rights were violated when his Polo watch was confiscated, he cannot show that the prison's grievance procedure was not a meaningful postdeprivation remedy.

sovereign immunity.[61]   The Pennsylvania General Assembly, however, waived sovereign immunity for claims of **negligence** against Commonwealth employees in a very limited and express set of circumstances.[62]   In particular, "[a] claim made by an inmate for **negligent** damage to the inmate's personal property while the property is within the possession of Commonwealth parties falls within the personal property exception to sovereign immunity," which is located at 42 Pa.C.S. § 8522(b)(3).[63]   "However, state employees do not lose their immunity for **intentional** torts, provided they are acting within the scope of their employment."[64]

Conversion, which is defined in Pennsylvania as "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification," is an intentional tort.[65]   Walton does not allege, nor has he produced any evidence, suggesting that these Defendants were negligent in confiscating his property.   Moreover, because all of the allegations against these particular SCI-Greene Defendants arose from their duties and powers as officers of SCI-Greene – as the alleged conduct occurred through a cell search, misconduct reports, and property inventories, – Walton has failed to establish that these SCI-Greene Defendants were acting outside the scope of their

---

[61]   1 Pa.C.S. § 2310.

[62]   42 Pa.C.S. § 8522(b) (waiving liability for negligent acts involving (1) vehicle liablity; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines).

[63]   Sloan v. Coleman, 2015 WL 5453073, *4 (Pa. Cmwlth. 2015) (unpublished) (emphasis added) (citing 42 Pa.C.S. § 8522(b)(3) and Williams v. Stickman, 917 A.2d 915, 918 (Pa. Cmwlth. 2007)).

[64]   Kull v. Guisse, 81 A.3d 148, 157 (Pa. Cmwlth. 2013) (citations omitted, emphasis added).

[65]   Sloan, 2015 WL 5453073, at *5; McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n. 3 (Pa. Super. 2000)).

employment.[66]   Accordingly, Walton's conversion claim against Defendants Craine, Gould, Tony, and Ramirez is barred by sovereign immunity.

Walton's conversion claim against MCF Defendants Karpinski and Barbier, however, is not barred by sovereign immunity because they are employees of the State of Michigan, not the Commonwealth of Pennsylvania.[67]   Nevertheless, as Defendants alternatively argue, Walton has failed to provide any evidence showing that Defendants Karpinski or Barbier deprived or interfered with Walton's property without his consent and without lawful justification.[68] Walton's contention that Karpinski or Barbier are responsible for his missing property in connection with the May 2011 transfer from MCF to SCI-Green is pure speculation, unsupported by any evidence.   As such, Karpinski and Barbier are also entitled to summary judgment on Walton's conversion claim.

### 3.     Procedural Due Process – Misconduct Hearing

Walton also asserts a claim for violation of the Procedural Due Process Clause of the Fourteenth Amendment relating to the disciplinary hearing associated with the misconduct that he received for allegedly fighting inmate Riley.   Walton alleges that prior to the misconduct hearing, Walton's request to call Riley as a witness in an effort to challenge the statement in the misconduct that Riley admitted to going into Walton's cell to "smash him" was denied.[69] Additionally, Walton's request to have the video evidence preserved to dispute that Riley was

---

[66]   See id. (citing Kull, 81 A.3d at 154-159; LaFrankie v. Miklick, 618 A.2d 1145, 1149 (Pa. Cmwlth. 1992)).

[67]   1 Pa.C.S. § 2310; 42 Pa.C.S. §§ 8521, 8522.   The Court notes that Defendants have not raised the defense of sovereign immunity under Michigan law regarding these two individuals.

[68]   See McKeeman, 751 A.2d at 659 n. 3.

[69]   Compl. at ¶¶ 93-94, 101-102.

the inmate on the video who entered Walton's cell on December 31, 2012 was denied.[70] According to Walton, although he ultimately pled guilty to fighting inmate Riley, he was coerced to do so by the hearing examiner, Defendant Nunez, because Walton faced a harsher sanction if found guilty, which Walton could not afford because he was facing court deadlines in his criminal case.[71]

Defendants argue, however, that summary judgment should be entered in favor of Nunez on this claim because Walton has not identified a protected liberty interest of which he was deprived. The Court agrees. In *Sandin v. Conner*, the Supreme Court held that the prisoner plaintiff did not have a protected liberty interest in remaining free of disciplinary detention or segregation when he was denied the opportunity to present witnesses at his disciplinary hearing, found guilty, and placed in disciplinary custody for 30 days.[72] According to *Sandin*, this punishment did not subject the prisoner plaintiff to an atypical and significant hardship in relation to the ordinary incidents of prison life, and thus, did not deprive the plaintiff of a State-created liberty interest.[73] Therefore, under these analogous facts, Defendant Nunez is entitled to summary judgment on this claim, as Walton has not established that he was deprived of a protected liberty interest when he was placed in the RHU for 30 days.[74]

Moreover, to the extent that Walton is asserting that he suffered a procedural due process violation when he was placed in administrative custody from the end of January 2013 until

---

[70] Id.

[71] Id. at 95-96, 103-105.

[72] 515 U.S. 472, 485-86 (1995).

[73] Id. at 484-488.

[74] See Coulston v. Glunt, 2014 WL 808762, *9 (W.D.Pa. 2014) ("Plaintiff's allegations do not support an entitlement to procedural due process protections with regard to his sanction of thirty days disciplinary custody.").

August 2013 immediately following the expiration of his 30 day sanction, Walton cannot establish that he was deprived of a protected liberty interest. In *Griffin v. Vaughn*, the United States Court of Appeals for the Third Circuit applied *Sandin* and concluded that the prisoner plaintiff's due process rights were not violated when he was held in administrative custody for 15 months.[75] "Given the considerations that lead to transfers to administrative custody of inmates at risk from others, inmates at risk from themselves, and inmates deemed to be security risks, etc., one can conclude with confidence that stays of many months are not uncommon."[76] Consequently, the *Griffin* court concluded that "the exposure to the conditions of administrative custody for periods as long as 15 months 'falls within the expected parameters of the sentence imposed [on him] by a court of law,'" and therefore, no protected liberty interest was implicated.[77]

Furthermore, other courts within this Circuit have held that the following stays in disciplinary or administrative custody did not create a constitutionally protected liberty interest: 930 days in disciplinary confinement; 256 days in the RHU followed shortly thereafter by 343 days in the RHU; 7 months in administrative custody; and 75 days in disciplinary custody.[78] Because Walton's additional stay of 7 months in administrative custody did not, by itself, create

---

[75]   112 F.3d 703 (1997).

[76]   Id. at 708; see also Allah v. Seiverling, 229 F.3d 220, 224 (3d Cir. 2000) ("*Sandin* instructs that placement in administrative confinement will generally not create a liberty interest.").

[77]   Griffin, 112 F.3d at 708.

[78]   See Young v. Beard, 227 F. App'x 138, 141 (3d Cir. 2007); Mearin v. Vidonish, 450 Fed. App'x 100, 102 (3d Cir. 2011); Smith v. Mensinger, 293 F.3d 641, 652 (3d Cir. 2002); Abney v. Walker, 2007 WL 1454265, *3 (W.D.Pa. 2007); see also Brown v. Blaine, 833 A.2d 1166, 1172 (Pa. Cmwlth. 2003) (four months in long term segregation unit did not constitute an atypical and significant hardship); but see Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (eight years in administrative custody implicates a protected liberty interest); Bowen v. Ryan, 248 Fed. App'x 302, 304-5 (3d Cir. 2007) (twenty years in administrative custody constitutes an atypical and significant hardship implicating a protected liberty interest).

a protected liberty interest, and because Walton has failed to otherwise produce any evidence showing that this placement imposed an atypical and significant hardship in relation to the ordinary incidents of prison life, he has not established that he suffered a violation of procedural due process.  Thus, Defendant Nunez, as well as any other Defendants from the PRC that Walton may have attempted to sue herein, are entitled to summary judgment on this claim.

### 4.  First Amendment Retaliation Claims

While the complaint does not contain an express count for First Amendment retaliation, Defendants' brief in support of their motion for summary judgment states that as best as they can discern, Walton claims that SCI-Greene Defendants Harkleroad, Rambler, Johnson, Gribble, Smith, Baker, Shrader, and Grego unlawfully retaliated against Walton in connection with the October 2012 misconduct for possessing contraband.  Defendants also believe that Walton may be asserting a First Amendment retaliation claim against those same Defendants for placing Walton in administrative custody for approximately 7 months immediately following the expiration of Walton's 30 day punishment in the RHU.  The Court agrees with Defendants that when liberally construing Walton's complaint, these First Amendment retaliation claims may be contained therein.  Thus, in light of Walton's status as a *pro se* litigant, to the extent that Walton has raised such claims, the Court will address the same.[79]

---

[79] The Court notes that in his submissions opposing summary judgment, Walton also suggests that he is bringing a First Amendment retaliation claim for an incident that occurred prior to when he was transferred to Michigan in December 2010.  Specifically, Walton alleges that a staff member went on the intercom and used racial slurs, Walton filed a grievance complaining of this incident, and that he was transferred to Michigan in retaliation for filing the grievance.  See (ECF No. 106 at 2).  This incident, however, is not in any way referenced in the complaint, and therefore, is outside the scope of this lawsuit.  Additionally, Walton alleges that he is pursuing a claim of ongoing retaliation against Harkleroad that started in August 2013 after Harkleroad was served with this lawsuit.  (Id. at 7-8, 14, 21). However, as the Court previously explained to Walton, a party cannot add a claim to a lawsuit by asserting it in a brief.  (ECF No. 73 at 10 n. 9).  This can only be accomplished by filing a separate motion with the Court seeking leave to amend the complaint and by attaching the proposed amended complaint to the motion.

In order to establish a *prima facie* claim for First Amendment retaliation, the plaintiff must prove (1) that he was engaged in constitutionally protected conduct, (2) that prison officials caused him to suffer an adverse action, and (3) that his constitutionally protected conduct was a substantial or motivating factor in the officials' decision to discipline him.[80]  However, even if the plaintiff establishes a *prima facie* claim, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."[81]

The Court agrees with Defendants that they are entitled to summary judgment on Walton's purported First Amendment retaliation claim with respect to the misconduct issued to Walton in late October 2012 for possession of contraband. Walton claims that this misconduct was issued in retaliation because he refused to comply with Officer Harkleroad's attempt to make Walton buy his watch back in exchange for cigarettes and because Walton told Lieutenant Shamp of this "unethical behavior."  Even assuming *arguendo* that Walton's behavior here qualifies as protected conduct, Walton is nonetheless unable to demonstrate that his protected conduct was a substantial or motivating factor in the disciplinary decision.  Walton was only sanctioned for possession of the pornography, which Walton does not dispute was contraband at SCI-Greene and which Walton pled guilty to possessing.  All other charges, including possession of the Polo watch, were dismissed.  Therefore, Walton cannot establish that he was disciplined for his refusal to be extorted by Harkleroad and for apprising Lieutenant Shamp of same.[82]

---

[80]    Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).

[81]    Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002) (emphasis removed) (quoting Rauser, 241 F.3d at 334).

[82]    See id. at 158 (although the prisoner asserted he was retaliated against for jailhouse lawyering, he was charged with misconduct for undisputed violations of prison policies and therefore appropriately faced discipline).

Moreover, even if Walton had established a *prima facie* case, Defendants are nevertheless entitled to summary judgment with respect to this incident because they have shown that they would have made the same decision for reasons reasonably related to a penological interest. Issuing inmates misconducts for possession of contraband is reasonably related to a legitimate penological interest. It is not disputed that pornography is contraband at SCI-Greene. Walton pled guilty to possessing pornography, all other charges were dismissed, and he was only disciplined for the possession of pornography. Therefore, Defendants have established that Walton would have been sanctioned to 30 days in the RHU for possession of pornography regardless of any protected activity.[83]

Defendants are also entitled to summary judgment on Walton's purported First Amendment retaliation claim associated with his continued confinement in administrative custody in the RHU for approximately seven months after his punishment for fighting had expired. It is unclear to the Court what protected activity Walton believes he engaged in here. Moreover, there is no evidence that any protected activity was a substantial or motivating factor in the decision to keep Walton in administrative custody. The decision to place Walton in the RHU for fighting was made by the hearing examiner while the decision to keep him in administrative custody was made by different individuals in the PRC. To the extent that Walton suggests someone forged the PRC decision, that is pure speculation unsupported by any evidence. The PRC decision stated that Walton's safety would be endangered if released back into general population. Walton denies ever admitting that he would be harmed if released back into general population, however, Walton's own exhibit contradicts this denial.

On January 16, 2013, when Walton was serving his 30 day punishment in the RHU for

---

[83] See <u>Laurensau v. Pluck</u>, 2013 WL 4779010, *13 (W.D.Pa. 2013) (collecting cases).

fighting, he sent a request slip addressed to Superintendent Folino, which was forwarded to Captain Haywood, stating that the rumors that he was a snitch have caused him to be in physical altercations, have created a lot of enemies, and have placed Walton in a position to be killed or harmed in the future.[84] Walton has not alleged or established that any individuals involved in the decision to hold him in administrative custody for his safety were responsible for spreading rumors to other inmates that he was a snitch. Thus, he cannot establish causation. Furthermore, Defendants have shown that Walton's placement in administrative custody was reasonably related to the legitimate penological interests of protecting inmates from attacks by other inmates based on the fact that Walton admits to being attacked on December 30 and 31, 2012, and in light of Walton stating that he feared for his life.

Therefore, to the extent that Walton has asserted claims for First Amendment retaliation regarding the above incidents, Defendants are entitled to summary judgment on same.

### 5. Eighth Amendment Claims

Walton asserts that Defendants Harkleroad, Shrader, and Grego have violated the Eighth Amendment for failure to protect. With respect to Officer Harkleroad, Walton claims that he told other inmates and staff members that Walton was a snitch when Walton was confined in the RHU in November 2012. Walton claims that when Officer Harkleroad made these statements, Harkleroad knew that such a label would put Walton's "safety at a high risk of being assaulted or even killed by other inmates," and that they actually "caused [Walton] to be attacked twice by two (2) unknown prisoners upon his release" from the RHU into the general population.[85]

To prevail on an Eighth Amendment claim for failure to protect from inmate violence, an

---

[84]  Pl.'s Ex. C, ECF No. 105-1 at 107.

[85]  Compl. at ¶¶ 70-79, ECF No. 8.

inmate must show that (1) he was incarcerated under conditions posing a substantial risk of harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused his harm.[86]   In this context, deliberate indifference is a subjective standard.  In other words, "[i]t is not sufficient that the official should have known of the risk;" rather, "the prison official-defendant must have actually known or been aware of the excessive risk to inmate safety."[87]  "Courts within the Third Circuit have recognized that being labeled a 'snitch' may constitute an Eighth Amendment violation if the prison official acted with deliberate indifference to a substantial risk of serious harm to the inmate."[88] Moreover, other appellate courts have reached similar conclusions.[89]

Defendants contend that Walton has no proof or first-hand knowledge that Officer Harkleroad spread the rumors that Walton was a snitch.  The Court finds, however, that Walton has come forward with sufficient evidence to withstand summary judgment.  In addition to the request slip that Walton addressed to Superintendent Folino stating that Officer Harkleroad labeled him a snitch,[90] Walton submitted a declaration from Gary Walker stating that the rumors

[86]   Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994) and Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997)).

[87]   Id. (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 130-33 (3d Cir. 2001)).

[88]   Williams v. Thomas, 2013 WL 1795578, *5 (E.D.Pa. 2013) (citing Cooper v. Beard, 2006 WL 3208783 (E.D.Pa. 2006); Culver v. Specter, 2012 WL 4793765 (M.D.Pa. 2012); Hendrickson v. Emergency Med. Servs., 1996 WL 472418 (E.D.Pa. 1996); Rodriguez v. Hayman, 2009 WL 4122251 (D.N.J. 2009); Shockley v. McCarty, 667 F.Supp.2d 741, 746-57 (D. Del. 2009); Rivera v. Tennis, 2010 WL 2838603 (M.D.Pa. 2010)); see also Laurensau v. Pluck, 2013 WL 4779010 (W.D.Pa. 2013).

[89]   See Northington v. Jackson, 973 F.2d 1518, 1525 (10th Cir. 1992); Miller v. Leathers, 913 F.2d 1085, 1088 n * (4th Cir. 1990); Valandingham v. Bojorquez, 866 F.2d 1135, 1139 (9th Cir. 1989); Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984); Irving v. Dormire, 519 F.3d 441, 451 (8th Cir. 2008); Gullatte v. Potts, 654 F.2d 1007, 1009-12 (5th Cir. 1981).

[90]   Pl.'s Ex. C, ECF No. 105-1 at 107.

that Walton was a snitch stemmed from Officer Harkleroad.[91] Walton also provided a declaration from William Shaw, which states that on September 3, 2013, he and another inmate heard Officer Harkleroad disparage Walton and call him a snitch.[92] Although this statement occurred approximately nine months after Walton was attacked for being a snitch, the next paragraph of Shaw's declaration also generally provides that Walton was falsely labeled a snitch by staff at SCI-Greene throughout the prison for attempting to recover his confiscated property.

When viewing this evidence in a light most favorable to Walton, the Court concludes that there is a genuine issue of material fact as to whether Officer Harkleroad was telling other inmates that Walton was a snitch prior to Walton being attacked.[93] Whether this evidence will ultimately be admissible at trial is not an issue that is currently before this Court.[94] At this stage of the proceedings where we are prohibited from weighing the evidence, however, this evidence produced by Walton sufficiently creates a genuine issue of material fact to preclude the entry of summary judgment in favor of Officer Harkleroad.

Defendants Lieutenant Shrader and Grego, who were Officer Harkleroad's supervisors, are, however, entitled to summary judgment on Walton's Eighth Amendment failure to protect claim. Walton contends that these Defendants are liable for failing to protect Walton after becoming aware that Harkleroad was spreading rumors to other inmates and staff that Walton

---

[91] Pl.'s Ex. 6, ECF No. 105-1 at 41-42.

[92] Id. at 40.

[93] See Miller v. Coning, 2014 WL 808023, *9 (D. Del. 2014) (finding that the plaintiff's submissions of numerous affidavits, grievances, and letters precluded summary judgment on an Eighth Amendment failure to protect claim against a guard for labeling the plaintiff a snitch; among this evidence was a sworn affidavit from an inmate stating that he observed another inmate tell the plaintiff that the plaintiff was a snitch and that "the police you snitched on said it").

[94] Indeed, the Court notes that Defendants have not opposed any of Walton's exhibits, including the Shaw and Walker declarations, and did not reply to Walton's twenty-five page response brief.

was a snitch.[95]  Here, Walton has failed to produce any evidence that either Lieutenant Shrader or Lieutenant Grego knew or were aware that Harkleroad was spreading these rumors.

Walton attempts to prove that Lieutenant Shrader and Lieutenant Grego knew that Officer Harkleroad was spreading these snitch rumors throughout the prison by pointing to the initial response to Walton's grievance relating to the watch.  This document states that Lieutenant Shrader and Lieutenant Grego interviewed Officer Harkleroad on November 11, 2012.[96]  Officer Harkleroad told Lieutenants Shrader and Grego that Walton admitted to Officer Harkleroad that a staff member gave Walton the watch.  Walton contends that this statement from Harkleroad to Shrader and Grego – that Walton admitted to receiving the watch from a staff member – is essentially the same as Harkleroad actually calling Walton a snitch to Shrader and Grego. Walton therefore asserts that Lieutenants Shrader and Gregro were aware that Officer Harkleroad was going around the prison calling Walton a snitch and that they were deliberately indifferent to this foreseeable danger.  This argument is without merit.

The fact that Officer Harkleroad told his supervisors that Walton admitted that another staff member gave Walton the watch does not establish that the supervisors had knowledge that Harkleroad was allegedly going around the prison and making similar statements to other inmates and staff.  There is absolutely no evidence that Lieutenants Shrader or Grego were aware that Harkleroad was engaging in such conduct or that they knew that Walton was facing any kind of danger from other inmates.  Nor is there any evidence in the record establishing that Lieutenant Shrader or Grego were aware that Officer Harkleroad had previously labeled other inmates snitches, as Walton contends.  Therefore, summary judgment should be granted in favor

---

[95]  Id. at ¶¶ 78-79.

[96]  Compl. at ¶¶ 85-86, ECF No. 8; Def.s' Ex. 4, ECF No. 91-1 at 24.

of Lieutenant Shrader and Lieutenant on Walton's Eighth Amendment failure to protect claim.

The Court also notes that Walton's complaint asserts that Lieutenants Shrader and Grego failed to train and supervise Harkleroad and others in the security department.[97] These Defendants are entitled to summary judgment on this claim because Walton does not identify a particular policy wherein Lieutenant Shrader or Grego's failure to train or supervise "amount[ed] to 'deliberate indifference' to the rights of persons with whom [their employees came] into contact.'"[98] Nor does Walton produce any evidence showing that their purported failure to train or supervise actually caused Walton's constitutional violation.[99] Therefore, summary judgment should also be entered in favor of Lieutenants Shrader and Grego on this Eighth Amendment failure to train and supervise claim.

### 6. Defendant Correctional Officer John Doe 1

Finally, the Court notes that Walton's complaint lists Correctional Officer John Doe 1 as a defendant in the caption. Although it is unclear, it appears from the complaint and from Plaintiff's summary judgment submissions that this John Doe defendant is either an employee of MCF or SCI-Greene and that he/she is alleged to have destroyed Walton's 19 inch television around the time of his transfer from MCF back to SCI-Greene in May 2011. Walton has not been able to discover the identity of this John Doe defendant. Contrary to Walton's suggestion that Defendants are responsible for figuring out this individual's identity, "[i]n the adversarial system of litigation the plaintiff is responsible for determining who is liable for [his] injury."[100]

---

[97] Compl. at ¶ 88, ECF No. 8.

[98] See Thomas v. Cumberland Cty, 749 F.3d 217, *222 (3d Cir. 2014) (quoting Carter v. City of Phila, 181 F.3d 339, 357 (3d Cir. 1999)).

[99] Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989)).

[100] Guyton v. Bacher, 2014 WL 3942813, *5 (W.D.Pa. 2014) (quoting Arthur v. Maersk, Inc., 434 F.3d

Rule 21 of the Federal Rules of Civil Procedure provides that "on motion or on its own, the court may at any time, on just terms, add or drop a party."[101] "Use of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified."[102] "If reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed" under Rule 21.[103] Because Walton has been unable to discover the true identity of Defendant Correctional Officer John Doe 1 despite being given the opportunity to do so in discovery, the Court recommends dismissing Defendant Correctional Officer John Doe 1 pursuant to Rule 21.

## III.    CONCLUSION

In accordance with the foregoing, it is respectfully recommended that Defendants' motion for summary judgment be granted in part and denied in part. It is recommended that summary judgment be entered in favor of all named Defendants on all of Walton's claims, except for the Eighth Amendment claim against Officer Harkleroad. It is further recommended that Defendant Correctional Officer John Doe 1 be dismissed from this action under Rule 21 of the Federal Rules of Civil Procedure.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b)(2) of the Federal Rules of Civil Procedure, and the Local Rules for Magistrates, the parties may file objections to this report and recommendation within fourteen (14) days after being served with a

---

196, 212 (3d Cir. 2006)).

[101]  Fed. R. Civ. P. 21.

[102]  <u>Blakeslee v. Clinton Cty</u>, 336 Fed. App'x 248, 250 (3d Cir. 2009).

[103]  <u>Id.</u>; <u>see also</u> <u>Guyton</u>, 2014 WL 3942813, at *5 ("Thus, fictitious parties should be dismissed if they are left unidentified at the close of discovery.") (citing <u>Hindes v. F.D.I.C.</u>, 137 F.3d 148, 155 (3d Cir. 1998); <u>Atlantic Used Auto Parts v. City of Phila.</u>, 957 F.Supp. 622, 625 (E.D.Pa. 1997)).

copy.  Failure to file timely objections will constitute a waiver of any appellate rights.[104]


Dated:  <u>March 3, 2016</u>.                                    By the Court,

                                                                <u>s/ Cynthia Reed Eddy</u>
                                                                Cynthia Reed Eddy
                                                                United States Magistrate Judge


cc:     **THE HONORABLE MAURICE B. COHILL, JR.**
        (via CM-ECF)

        **MARCUS WALTON**
        BE-7837
        SCI Greene
        175 Progress Drive
        Waynesburg, PA 15370

        **TIMOTHY MAZZOCCA**
        (via CM-ECF)

---

[104]  <u>Brightwell v. Lehman</u>, 637 F.3d 187, 193 n. 7 (3d Cir. 2011).